## IN THE UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **UMB BANK, N.A., AS TRUSTEE FOR THE REGISTERED HOLDERS OF $9,000,000 BUILD NYC RESOURCE CORPORATION REVENUE BONDS (FENCERS CLUB, INC. PROJECT), SERIES 2018,** | : : : : : : : | **CIVIL ACTION** |
| **Plaintiff,** | : : | **NO.** |
| **v.** | : : | |
| **FENCERS CLUB, INC.,** | : : | |
| **Defendant.** | : : : : : | |

## COMPLAINT

Plaintiff, UMB Bank, N.A., as Trustee for the registered holders of $9,000,000 Build NYC Resource Corporation Revenue Bonds (Fencers Club, Inc. Project), Series 2018 ("<u>Trustee</u>"), for its Complaint against defendant, Fencers Club, Inc. ("<u>Borrower</u>"), avers as follows:

## I.    PARTIES, JURISDICTION AND VENUE

1.    UMB Bank, N.A., is a national association with its main office located in Kansas City, Missouri, as designated in its Articles of Association.

2.    Borrower is a New York not-for-profit corporation with an address of 20 West 33rd Street, 2nd Floor, New York, NY 10001.

3.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds $75,000 and the action is between citizens of different states.

4.      Venue exists in this judicial district pursuant to 28 U.S.C. § 1391(a)(2) because the real property that is the subject of this action is situated in this district.

II.     **FACTS**

A.      **The Issuance of the Bonds and the Making of the Loan**

5.      On or about December 13, 2018, Build NYC Resource Corporation, a local development corporation duly organized and existing under the laws of the State of New York and having its principal office at 1 Liberty Plaza, 14th Floor, New York, New York 10006 ("Issuer" or "Build NYC"), issued $9,000,000 in Build NYC Resource Corporation Revenue Bonds (Fencers Club, Inc., Project), Series 2018 (the "Bonds") under an Indenture of Trust dated as of December 1, 2018 (the "Indenture") by and between the Issuer and The Bank of New York Mellon, the original trustee ("Original Trustee").  A copy of the Indenture is attached hereto as ***Exhibit A***.

6.      233 Genesee Street Corporation (the "Initial Bonds Purchaser" or the "Holder") purchased 100% of the Bonds pursuant to that certain Bond Purchase and Continuing Covenants Agreement, dated as of December 13, 2018 (the "Bond Purchase Agreement"), by and between the Holder and the Borrower.  A copy of the Bond Purchase Agreement is attached hereto as ***Exhibit B***.

7.      Under the Indenture, 233 Genesee Street Corporation is designated as the "Initial Bonds Purchaser" and as the "Holder." (*See* Indenture at § 1.01, p. 12.)

8.      As of the date hereof, the Holder continues to hold 100% of the Bonds.

9.      At closing, the Issuer loaned the proceeds of the purchase of the Bonds to the Borrower, pursuant to that certain Loan Agreement, dated as of December 1, 2018 (the "Loan Agreement"), by and between the Issuer and the Borrower, for the purposes stated in the Indenture, which are: to (1) finance the costs of the acquisition, renovation, furnishing and equipping of an approximately 13,998 square foot commercial condominium unit on the second floor of an

approximately 176,000 square foot building on an approximately 14,812 square foot parcel of land, located at 20 West 33rd Street, New York, New York 10001 (the "Property"); and (2) pay for certain costs of issuance of the Bonds and reserve funds, if any, (collectively, the "Project"). A copy of the Loan Agreement is attached hereto as *Exhibit C*.

10.     The Bonds are evidenced by that certain Promissory Note, dated December 13, 2018, executed by the Borrower in favor of Issuer, in the principal amount of $9,000,000, which was endorsed by the Issuer to the Original Trustee, and which was endorsed by the Original Trustee to the Trustee (the "Note"), a copy of which, with the endorsements, is attached hereto as *Exhibit D*.

11.     To secure repayment of the Bonds and the Note, the Borrower executed in favor of the Issuer and the Original Trustee a Mortgage and Security Agreement (Acquisition Loan), dated as of December 1, 2018, and recorded December 26, 2018 in the NYC Department of Finance Office of the City Register in CRFN 2018000424286 (the "Mortgage"), a copy of which is attached hereto as *Exhibit E*, with respect to the Property.

12.     The Issuer assigned all of its right, title, and interest in, to, under, and in respect of the Mortgage to the Original Trustee pursuant to that certain Assignment of Mortgage and Security Agreement (Acquisition Loan), dated as of December 1, 2018, by the Issuer in favor of the Original Trustee, recorded December 26, 2018 in the NYC Department of Finance Office of the City Register in CRFN 2018000424287 (the "Issuer Assignment of Mortgage"). A copy of the Issuer Assignment of Mortgage is attached hereto as *Exhibit F.*

13.     To secure repayment on the Bonds and the Note, the Borrower granted to the Original Trustee, as trustee for the benefit of the Holder, a security interest in all of the Borrower's right, title, and interest in, to, and in respect of "all personal property and fixtures

…,wherever located, whether now existing or owned or hereafter arising or acquired," pursuant to that certain Security Agreement, dated as of December 13, 2018 (the "Security Agreement"), a copy of which is attached hereto as ***Exhibit G***, with respect to the Property.

14.     On January 23, 2024, the Original Trustee delivered to the Issuer, the Borrower, and the Holder a Notice of Resignation, giving notice of the Original Trustee's intention to resign as trustee under the Indenture effective March 26, 2024 (the "Notice of Resignation"). A copy of the Original Trustee's Notice of Resignation is attached hereto as ***Exhibit H.***

15.     On March 27, 2024, effective as of March 27, 2024, the Issuer, the Original Trustee, and the Trustee, as successor trustee. executed that certain Agreement of Resignation, Appointment, and Acceptance (the "Trustee Succession Agreement"), pursuant to which (a) the Issuer (1) accepted the Original Trustee's resignation as trustee under the Indenture, and (2) appointed the Trustee as trustee under the Indenture, and (b) the Trustee accepted its appointment as trustee under the Indenture. A copy of the Trustee Succession Agreement is attached hereto as ***Exhibit I.***

16.     In connection with and in furtherance of the Trustee Succession Agreement, the Original Trustee executed and delivered to the Trustee (a) an endorsement to the Note, dated as of March 27, 2024 (the "Succession Note Endorsement"), (b) an Assignment of Mortgage and Security Agreement, dated as of March 27, 2024, recorded April 1, 2024, as Instrument No. 2024040100806001 (the "Succession Assignment of Mortgage"), (c) and an Assignment of Security Agreement, dated as of March 27, 2024 (the "Succession Assignment of Security Agreement"), together with all documents, agreements, and instruments executed or delivered in connection with and/or in furtherance thereof. Copies of the Succession Note Endorsement, the

Succession Assignment of Mortgage, and the Succession Assignment of Security Agreement are attached hereto as *Exhibit J, Exhibit K,* and *Exhibit L*, respectively.

17.    The Notice of Resignation, the Trustee Succession Agreement, the Succession Note Endorsement, the Succession Assignment of Mortgage, and the Succession Assignment of Security Agreement, together with all agreements, documents, and instruments executed in connection therewith and/or in furtherance thereof, are referred to herein, collectively, as the "Succession Documents."

18.    The Indenture, the Loan Agreement, the Note, the Mortgage, the Security Agreement, and the Issuer Assignment of Mortgage, as amended and/or assigned by the Succession Documents, together with all agreements, documents, and instruments executed and/or delivered in connection therewith and/or in furtherance thereof are referred to herein, collectively, as the "Loan Documents."

**B.    Relevant Contractual Provisions**

19.    The Mortgage "secures the payment, performance and observance of the Obligations and shall continue in full force and effect until the Obligations shall be paid and satisfied in full or otherwise provided for in accordance with their respective terms."  (*See* Mortgage at p. 4.)

20.    The Mortgage defines "Obligations" as "(i) payment of the Secured Principal Amount of the Bonds and the indebtedness represented thereby, the Purchase Price, if applicable, and the Redemption Price, if any, and interest on the Bonds according to their tenor and effect and the performance and observance by the Issuer of all the covenants expressed or implied in the Bonds and in the Project Documents, and (ii) payment, performance, and observance of all obligations of the Debtor under the Project Documents including this Mortgage, whether now arising or hereafter arising, direct or indirect, absolute or contingent, joint or several, due or

to become due, liquidated or unliquidated, secured or unsecured, original, renewed, or extended, whether arising directly or acquired from others (all such indebtedness and obligations described in clauses (i) and (ii) above being collectively referred to herein as the "Obligations")." (*See* Mortgage at p. 2.)

21.    Under the Mortgage, "Secured Principal Amount" means $9,000,000. (*See* Mortgage at § 1.1, p. 7.)

22.    Borrower is the owner of the Property located at 20 West 33rd Street, New York, New York 10001, as more fully described in Exhibit A to the Mortgage, which, together with the Improvements thereon, as defined in the Mortgage and the Loan Agreement, has been operated at all relevant times for the Borrower's programs which provide instruction and training in the sport of fencing.

23.    The Mortgage provides that "the Debtor does hereby grant, bargain, sell, convey, transfer, mortgage, grant a security interest in, pledge and assign to the Issuer and the Trustee as Mortgagee, and their respective assigns forever, its right, title and interest in and to the …Mortgaged Property." (*See* Mortgage at p. 2.)

24.    "Mortgaged Property" is defined to include: (1) the Facility Realty, (2) the Facility Personalty, (3) "[all] property insurance proceeds…," (4) "[all] right, title and interest of the Debtor in and to (a) any and all present and future leases of space in any building(s) on or to be erected upon the Facility Realty; (b) any and all present and future subleases of space in any building(s) on or to be erected upon the Facility Realty; (c) all rents, issues and profits payable under any such leases and subleases; (d) any contracts for the sale of all or any portion of the Facility Realty or any building(s) or portions thereof on or to be erected upon the Facility Realty…; and (e) any interest of the Debtor in contracts, agreements or other arrangements with architects,

engineers and other professionals responsible for the design and supervision of the Project Work….," (5) "[all] right, title and interest of the Debtor in all proceeds of any unearned premiums on any insurance policies…concerning the Facility…," (6) "[all] right, title and interest of the Debtor in all construction contracts, payment bonds, performance bonds, surety bonds, warranties, guarantees, maintenance, repair or replacement agreements and other contractual obligations of any contractor, subcontractor, surety, guarantor, manufacturer, dealer, laborer, supplier or materialman made with respect to the Facility or any part thereof," (7) "[all] the right, in the name and on behalf of the Debtor, to appear in and defend any action or proceeding brought with respect to the Facility and to commence any action or proceeding to protect the interest of the Mortgagee in the Facility," (8) "[any] and all air rights, development rights, zoning rights or other similar rights or interests which benefit or are appurtenant to the Facility and any proceeds arising therefrom," (9) "[all] agreements …and/or contracts now or hereafter entered into by the Debtor for the Project Work or any part thereof, and all permits, licenses, bonds, plans and specifications relative to the Project," (10) "[any] and all further estate, right, title, interest, property, claim and demand whatsoever of the Debtor in and to any of the above," (11) "[any] and all other property of every kind and nature from time to time which was heretofore or hereafter is by delivery or by writing of any kind conveyed, mortgaged, pledged, assigned or transferred, as and for additional security hereunder, by the Debtor or by any other Person with or without the consent of the Debtor, to the Mortgagee which is hereby authorized to receive any and all such property at any time and at all times to hold and apply the same subject to the terms hereof," (12) "[all] proceeds of the conversion, voluntary or involuntary, of any of the foregoing into cash or liquidated claims." (*See* Mortgage at pp. 2-4.)

25.     "Facility Realty" comprised of the "Facility Unit" (meaning Unit No. 2002) and the Facility Common Elements.  (*See* Mortgage at p. 6.)

26.     "Facility Personalty" means, in pertinent part, "those items of machinery, equipment and other items of personalty the acquisition and/or the installation of which is to be financed in whole or in part with the proceeds of the Bonds for installation or use at the Facility Realty."  (*See* Mortgage at p. 6.)

27.     Under the Mortgage, an Event of Default exists if, among other things, (1) "the Debtor [fails] to pay any amount that has become due and payable hereunder, and continuance of such failure for a period of five (5) Business Days after written notice has been given to the Debtor specifying the nature of such default by the Mortgagee," (2) "the Debtor [fails] to observe and perform any covenant, condition or agreement hereunder on its part to be performed … and … continuance of such failure for more than thirty (30) days after written notice," of such failure has been given to the Debtor specifying the nature of such failure by the Mortgagee; and (3) "[an] 'Event of Default' under any Project Document shall occur and be continuing."  (*See* Mortgage at § 5.5.)

28.     The Indenture defines "Project Documents" as "the Institution Documents and the Security Documents."  (*See* Indenture at § 1.01, p. 19.)

29.     The Indenture defines "Security Documents" to mean "the Loan Agreement, the Bond Purchase and Continuing Covenants Agreement, the Environmental Indemnity Agreement, the Promissory Note, the Security Agreement, this Indenture, the Tax Certificate, the Mortgage and the Assignment of Mortgage."  (*See* Indenture at § 1.01, p. 23.)

30.    Pursuant to Section 8.01(a)(5) of the Indenture, "[the] occurrence of an 'Event of Default' under the Loan Agreement or any other Security Document" constitutes an Event of Default under the Indenture.  (*See* Indenture at § 8.01(a)(5), p. 80.)

31.    Pursuant to Section 8.01(b) of the Indenture, "[upon] the happening and continuance of any Event of Default,…either the Trustee…or the Holders of over twenty-five percent (25%) in aggregate principal amount of the Bonds Outstanding…may declare the principal …of all the Bonds then Outstanding, and the interest accrued thereon, to be due and payable immediately, and upon such declaration the same shall become and be immediately due and payable, anything in this Indenture or in any of the Bonds contained to the contrary notwithstanding."  (*See* Indenture at § 8.01(b), p. 81.)

32.    Section 8.02(a) of the Indenture provides, in pertinent part, that "[upon] the occurrence and continuance of any Event of Default, then and in every case the Trustee may proceed, and upon the written request of the Holders of over twenty-five percent (25%) in aggregate principal amount of the Bonds Outstanding shall proceed, to protect and enforce its rights and the rights of the Bondholders under the Bonds, the Loan Agreement, this Indenture and under any other Security Document forthwith by such suit, actions or special proceedings in equity or at law…for the enforcement of any legal or equitable rights or remedies as the Trustee, being advised by counsel, shall deem most effectual to protect and enforce such rights."  (*See* Indenture at § 8.02(a), pp. 81-82.)

33.    Section 8.02(d) of the Indenture provides that "[while] the Bonds are in the Bank Purchase Rate Mode, upon an Event of Default, the Bonds shall bear interest at the Default Rate from the date of the occurrence of such Event of Default until the Bonds have been fully redeemed or the Event of Default is cured."  (*See* Indenture at § 8.02(d), p. 82.)

34.     Under the Indenture, "Default Rate" means "five percent (5%) in excess of the Prime Rate then in effect, which shall be no higher than the maximum lawful prevailing rate." (*See* Indenture at § 8.12, p. 86.)

35.     For purposes of the Indenture, "Prime Rate" means "the rate announced by Manufacturers and Traders Trust Company."  (*See* Indenture at § 1.01, p. 18.)

36.     Section 5.28 of the Bond Purchase Agreement requires the Borrower to comply with the following financial covenants:  (a) maintain a Debt Service Coverage Ratio of: (i) not less than 1.10 to 1.00, before and through August 31, 2021, which Debt Service Coverage Ratio is to be calculated semi-annually, and (ii) not less than 1.20 to 1.00, after August 31, 2021, which Debt Service Coverage Ratio is to be calculated semi-annually; (b) maintain Minimum Liquidity in the amount of $1,000,000, tested semi-annually; and (c) not create, assume, incur or otherwise become liable for any Indebtedness without the prior written consent of the Purchaser." (*See* Bond Purchase Agreement at § 5.28.)

37.     Section 5.36 of the Bond Purchase Agreement (Equity Contribution) provides that

> "[the] Purchaser, in its sole reasonable discretion, may require the Borrower to fund an additional $360,000 in the Interest Account at the end of the 2020 Fiscal Year if the Borrower's budget for the year 2021 demonstrates Borrower's inability to comply with the financial covenants set forth in Section 5.28 hereof."  (*See* Bond Purchase Agreement at § 5.36.)

38.     Pursuant to a letter agreement dated April 1, 2020 (the "April 1, 2020 Letter Agreement"), the Purchaser and the Borrower agreed that in consideration for the Purchaser agreeing to permit the Borrower to use certain funds then held in the Interest Account "to pay six months of interest on the [Bonds] , commencing with the May 1, 2020 interest payment date," the Borrower acknowledged and agreed that (i) the Purchaser may, as stated in Section 5.36 of the

Bond Purchase Agreement (quoted above), require the Borrower to fund an additional $360,000 in the Interest Account at the end of the 2020 Fiscal Year" if the Purchaser determines, in its sole reasonable discretion, that the Borrower's 2021 budget demonstrates an inability of the Borrower to comply with the financial covenants, and (ii) the Borrower must continue to comply with the financial covenants set forth in Section 5.28 of the Bond Purchase Agreement.  A copy of the April 1, 2020 Letter Agreement is attached hereto as ***Exhibit M.***

39.    As a result of certain defaults and Events of Default having occurred as a result of the Borrower having failed to (i) comply with the delivery of consolidated income and cash flow statements (required by Section 5.3(b) of the Bond Purchase Agreement) for the period ending August 31, 2020, and (ii) maintain a Debt Service Coverage Ratio of less than 1.10 to 1.00 (required by Section 5.28(a) of the Bond Purchase Agreement) for the period ending August 31, 2020 (collectively, the "August 31, 2020 Covenant Defaults"), the Borrower requested that the Purchaser waive the August 31, 2020 Covenant Defaults.  In consideration of the Purchaser's agreement to waive the August 31, 2020 Covenant Defaults, the Borrower agreed that "Pursuant to that certain letter dated April 1, 2020 and our recent discussions, Borrower is required to replenish its Interest Account in an amount of $360,000 no later than December 31, 2021." (the "August 31, 2020 Covenant Default Waiver Letter Agreement").  A copy of the August 31, 2020 Covenant Default Waiver Letter Agreement is attached hereto as ***Exhibit N.***

40.    As noted above, Section 8.02(d) of the Indenture provides that "[w]hile the Bonds are in the Bank Purchase Interest Rate Mode, upon an Event of Default, the Bonds shall bear interest at the Default Rate from the date of the occurrence of such Event of Default until the Bonds have been fully redeemed or the Event of Default is cured."  (*See* Indenture at § 8.02(d).)

41.     The only Bonds that have been issued are the Bonds held by the Holder as Initial Bonds Purchaser.  "Bank Purchase Interest Rate Mode" for present purposes means the interest rate mode applicable to the Initial Bonds.  As noted in Section 2.03(j) of the Indenture, "[the] Initial Bonds shall be issued in Bank Purchase Interest Rate Mode."  (*See* Indenture at § 2.03(j).)

42.     The Loan Agreement provides that, "[u]pon an Event of Default, Lender may exercise any or all of its rights and remedies provided under the Loan Documents and Borrower will pay all associated costs, including Attorneys' Fees and Costs."  (Loan Agreement § 8.03(a).)

43.     The Mortgage provides that:

> At any time after the occurrence of an Event of Default, Lender, at Lender's option, may declare the Indebtedness to be immediately due and payable without further demand, and may foreclose this Instrument by judicial or nonjudicial proceedings, will be entitled to the appointment of a receiver, without notice, and may invoke any other remedies permitted by New York law or provided in this Instrument, the Loan Agreement or in any other Loan Document.

(Mortgage § 31.)

**C.      Borrower's Default on its Obligations**

44.     Subsequent to the August 31, 2020 Covenant Default Waiver Letter Agreement, the Borrower continued to fail to comply with its financial covenants, financial reporting requirements, and other obligations under the Bond Purchase Agreement.

45.     The Borrower has been in default of its obligations since August 31, 2021, as a result of the Borrower having failed to (i) comply with the delivery of consolidated income and cash flow statements (required by Section 5.3(b) of the Bond Purchase Agreement) for the period ending August 31, 2021, and (ii) maintain a Debt Service Coverage Ratio of less than 1.10 to 1.00 (required by Section 5.28(a) of the Bond Purchase Agreement) for the period ending August 31, 2021.

46.     Moreover, notwithstanding the clear and plain language of Section 5.36 of the Bond Purchase Agreement, and the Borrower's acknowledgement and agreement in both the April 1, 2020 Letter Agreement and the August 31, 2020 Covenant Default Waiver Letter Agreement, the Borrower failed to replenish the Interest Account in an amount of $360,000 by December 31, 2021, which failure continues as of the date of this Complaint.

47.     As a result of such defaults and Events of Default, the Purchaser delivered to the Borrower, the Issuer, and the Original Trustee a reservation of rights letter dated February 3, 2023 (the "February 3, 2023 ROR Letter"), notifying the Borrower and the other parties that defaults and Events of Default had occurred and were continuing as a result of, among other things, the Borrower having (i) failed to comply with the Debt Service Coverage Ratio required by Section 5.28(a) of the Purchase Agreement, (ii) failed to comply with the Liquidity covenant required by Section 5.28(b) of the Purchase Agreement, (iii) failed to timely deliver to the Purchaser financial reporting required by Section 5.3 of the Purchase Agreement, including, without limitation, the annual income and cash flow statement required by Section 5.3(b), and covenant compliance certificates required by Section 5.3(f), (iv) incurred additional indebtedness prohibited by Section 5.28(c) in connection with cash collateralization reimbursement obligations in connection with a letter of credit, (v) permitted a mechanics lien in excess of the Permitted Encumbrances to be recorded against the property in violation of Section 8.1 of the Purchase Agreement and Section 2.5(a) of the Mortgage, and (vi) failed to fund the additional amount of $360,000 into the Interest Account by December 31, 2021, as required by Section 5.36 of the Purchase Agreement, as amended by that certain letter agreement dated April 1, 2020 by and between the Purchaser and the Borrower, and that certain waiver letter by and between the

Purchaser and the Borrower.  A copy of the February 3, 2023 ROR Letter is attached hereto as ***Exhibit O.***

48.    The February 3, 2023 ROR Letter further notified the Borrower that "[as] a result of said defaults, (a) effective as of August 31, 2021…, the Bond, at the option of the Purchaser, will accrue interest at the Default Rate, as authorized by Section 2.02(d) of that certain Indenture of Trust, dated as of December 1, 2018, and (b) the Purchaser may immediately exercise at its option and without notice, and reserves its right to exercise, all of the remedies set forth under the Purchase Agreement, the other Bond Documents, and/or applicable law."

49.    Following the Holder's issuance of the February 3, 2023 ROR Letter, the Holder and the Borrower entered into discussions of a possible forbearance arrangement, but were unable to reach an agreement for any such forbearance.  On or about June 13, 2023, the Holder delivered to the Borrower and the other parties a letter stating that discussions of a forbearance arrangement had failed to produce an agreement and that such discussions were terminated (the "June 13, 2023 ROR Letter").  In the June 13, 2023 ROR Letter, the Holder stated that, as the Holder had previously stated in the February 3, 2023 ROR Letter, the Bonds bear interest at the Default Rate from the date of the occurrence of the Event of Default, which is August 31, 2021. The Holder advised the Borrower that as of June 12, 2023, accrued unpaid interest with respect to the Bonds was in the amount of $1,020,034.88.  A copy of June 13, 2023 ROR Letter is attached hereto as ***Exhibit P.***

50.    Subsequent to the Holder's delivery to the Borrower of the June 13, 2023 ROR Letter, the Borrower failed to pay in full the outstanding accrued interest.  Pursuant to a letter dated August 31, 2023, the Holder notified the Borrower and the other parties that defaults and Events of Default had occurred and were continuing as a result of, among other things, all of the

Events of Default previously identified in the February 3, 2023 ROR Letter and the June 13, 2023 ROR Letter, further defaults and Events of Default had occurred and were continuing as a result of the Borrower's failure to pay in full the outstanding accrued interest (the "August 31, 2023 ROR Letter").  A copy of August 31, 2023 ROR Letter is attached hereto as ***Exhibit Q.***  The February 3, 2023 ROR Letter, the June 13, 2023 ROR Letter, and the August 31, 2023 ROR Letter are referred to herein, collectively, as the "ROR Letters").

51.    Subsequent to the Holder's delivery to the Borrower of the August 31, 2023 ROR Letter, the Borrower continued to be in default of its obligations as a result of the continuance of all of the defaults and Events of Default identified in the ROR Letters (the "Continuing Defaults").

52.    As a result of the Continuing Defaults, on or about November 14, 2023, pursuant to Section 8.01(b) of the Indenture and Sections 6.2(a) and 6.2(b) of the Bond Purchase Agreement, the Holder issued a default and demand letter to the Borrower, demanding payment in full of all amounts under and in respect of the Bonds (the "November 2023 Demand Letter").  A copy of November 2023 Demand Letter is attached hereto as ***Exhibit R.***

53.    Subsequent to the Holder's issuance of the November 2023 Demand Letter, the Borrower represented to the Holder that the Borrower was seeking third-party refinancing to resolve the indebtedness arising from the Bond.

54.    The Borrower presented to the Holder a copy of a term sheet for such refinancing with a proposed closing by Labor Day 2024, which date was then extended to September 27, 2024, and then again extended to October 15, 2024.

55.    However, on October 15, 2024, the Borrower informed the Holder that the Borrower's refinancing would not occur.

56.     In light of the failure of the Borrower's refinancing efforts, and as a result of the Continuing Defaults, on or about October 28, 2024, pursuant to Section 8.01(b) of the Indenture and Sections 6.2(a) and 6.2(b) of the Bond Purchase Agreement, the Holder issued a default and demand letter to the Borrower, demanding payment in full of all amounts under and in respect of the Bonds (the "October 2024 Demand Letter").  A copy of October 2024 Demand Letter is attached hereto as ***Exhibit S***.

57.     In November 2024, subsequent to the October 2024 Demand Letter, the Borrower advised the Holder that the Borrower was working with a potential investor who was interested in purchasing the Bonds (the "Proposed Bond Purchase"), and that the closing on the Proposed Bond Purchase would occur either at the end of December 2024 or in January 2025. When the closing on the Proposed Bond Purchase failed to occur as promised, the Borrower advised the Holder that the closing would instead occur in February 2025.  The closing on the Proposed Bond Purchase did not close in February 2025.

58.     Having heard nothing from the Borrower since February 2025, and as a result of the Continuing Defaults, on or about April 28, 2025, pursuant to Section 8.01(b) of the Indenture and Sections 6.2(a) and 6.2(b) of the Bond Purchase Agreement, the Holder issued a default and demand letter to the Borrower, demanding payment in full of all amounts under and in respect of the Bonds (the "April 2025 Demand Letter").  A copy of April 2025 Demand Letter is attached hereto as ***Exhibit T.***

59.     Notwithstanding the ROR Letters, the November 2023 Demand Letter the October 2024 Demand Letter, and the April 2025 Demand Letter, Borrower failed to pay the amounts due and owing under and in respect of the Bonds.

60.     On or about January 28, 2025, the Holder, pursuant to Sections 8.12 and 9.12 of the Indenture, Section 6.2(a) of the Bond Purchase Agreement, and Section 5.6(c) of the Mortgage, directed the Trustee to commence this action to enforce the Trustee's rights and remedies, as trustee under the Indenture for the benefit of the Holder.  A copy of Direction Notice is attached hereto as ***Exhibit U.***

61.     Accordingly, the Trustee brings this action to foreclose the Mortgage under the Loan Documents and New York law.

**D.     Amounts Due and Owing**

62.     As of May 13, 2025, there was due and owing on the Loan and the Bonds without defense, deduction, offset, recoupment, or counterclaim the total amount of $11,229,441.42**,** itemized as follows:

| | |
|---|---|
| Principal Balance | $8,534,749.31 |
| Interest | $2,241,526.84 |
| Costs and Other Expenses Under Bond Documents | $    77,621.20 |
| Appraisal Fees: | $    30,062.50 |
| Legal Fees (as of 3/31/2025) | $   345,481.57 |
| TOTAL AMOUNT DUE as of 5/13/2025 | $11,229,441.42* |

**\*As it relates to the legal fees, the above amount is as of 3/31/2025, not 5/13/2025, legal fees as they are incurred will be added to the total**.

63.     Additional Note and Default Interest, together with other fees, charges and costs recoverable under the Loan Documents, continue to accrue on the Loan and the Bonds.

## <u>COUNT ONE – MORTGAGE FORECLOSURE</u>

64.     Paragraphs 1 through 63 of this Complaint are incorporated herein by reference.

65.    Borrower executed the Note, which is secured by the Mortgage, in favor of the Trustee, as trustee under the Indenture for the benefit of the Holder.

66.    Borrower has defaulted on its obligations under the Note, the Mortgage, the Loan Agreement and the Other Loan Documents.

67.    The Trustee is authorized by the Mortgage and by New York law to foreclose the Mortgage in the event of a default by Borrower.

68.    There is currently due and owing on the Loan and the Bonds the sum of $11,229,441.42, together with accrued and accruing interest, default interest, fees, charges and costs recoverable under the Loan Documents.

**WHEREFORE**, the Trustee respectfully requests entry of judgment in its favor on Count One of the Complaint:

(a)    Fixing the amount due on the Mortgage;

(b)    Barring and foreclosing Borrower from and of any equity of redemption in and to the Property;

(c)    Directing that the Trustee be paid the amount due on the Mortgage, together with additional accrued and accruing interest (at the Default Rate), fees, charges and costs recoverable under the Loan Documents (including but not limited to court costs and attorneys' fees);

(d)    Adjudging that the Property be sold according to law to satisfy the amount due the Trustee;

(e)    Appointing a receiver for the Property pending foreclosure; and

(f)    For such other and further relief as the Court in its discretion may deem equitable and just.

## COUNT TWO – PERSONAL PROPERTY FORECLOSURE

69.     Paragraphs 1 through 68 of this Complaint are incorporated herein by reference.

70.     Borrower granted to the Trustee, for the benefit of the Holder, in the Mortgage a security interest in, *inter alia*, certain personalty (the "Personalty") as more fully described in Pages 2-4 of the Mortgage, which are incorporated herein by reference.

71.     The Trustee's security interest in fixtures and personal property granted under the Mortgage was perfected by (a) a UCC-1 financing statement filed December 21, 2018 with the NYC Department of Finance Office of the City Register (the "City Register") as Document # 2018000420612, which was assigned to UMB Bank, N.A. as Successor Trustee via a UCC-3 Amendment filed with the City Register on May 9, 2024, as Filing No. 2024050900295001 (the "Mortgage Financing Statement #1"), and (b) a UCC-1 financing statement filed January 10, 2019 with the New York Secretary of State (the "Secretary") as Document # 201901100014609, which was amended as to the Debtor's address via a UCC-3 Amendment filed with the Secretary on July 2, 2021, as Filing No. 202107020240090, and which was assigned to UMB Bank, N.A., as Successor Trustee via a UCC-3 Amendment filed with the Secretary on April 2, 2024, as Filing No. 202404020116047 (the "Mortgage Financing Statement #2").  Copies of Mortgage Financing Statement #1 and Mortgage Financing Statement #2 are attached hereto as ***Exhibit V and W,*** respectively.

72.     The Trustee's security interest in fixtures and personal property granted under the Security Agreement was perfected by a UCC-1 financing statement filed with the New York Secretary of State (the "Secretary") on December 20, 2018, as Filing No. 201812200606199, which was amended as to the Debtor's address via a UCC-3 Amendment filed with the Secretary on July 2, 2021, as Filing No. 202107020240103, and which was assigned to UMB Bank, N.A.,

as Successor Trustee via a UCC-3 Amendment filed with the Secretary on April 2, 2024, as Filing No. 202404020116059 (the "Security Agreement Financing Statement").  A copy of the Security Agreement Financing Statement is attached hereto as **Exhibit X**.

73.    Borrower has defaulted on its obligations under the Note, the Mortgage, the Loan Agreement and the Other Loan Documents.

74.    The Trustee is authorized by New York law to foreclose its security interest in the Personalty in the event of a default by Borrower.

75.    The Trustee, on behalf of the Holder, hereby elects to have the Personalty sold at public sale together with the real property under the Mortgage.

**WHEREFORE**, the Trustee, on behalf of the Holder, respectfully requests entry of judgment in its favor on Count Two of the Complaint adjudging that the Personalty be sold together with the real property under the Mortgage according to law to satisfy the amount due the Trustee, for the benefit of the Holder, and for such other and further relief as the Court in its discretion may deem equitable and just.

Dated:  May 14, 2025                              _/s/ Ana M. Blanco_
                                                  Ana M. Blanco, Esq.
                                                  Diane E. Vuocolo, Esq.
                                                  BALLARD SPAHR LLP

                                                  1675 Broadway, 19th Floor
                                                  New York, NY 10019-5820
                                                  (646) 346-8072 (A. Blanco)
                                                  (215) 864-8162 (D. Vuocolo)
                                                  blancoa@ballardspahr.com
                                                  vuocolod@ballardspahr.com


                                                  and

                                                  1735 Market Street, 51st Floor
                                                  Philadelphia, PA 19103-7599
                                                  (212) 223-0200

                                                  Counsel for Plaintiff